

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00105-CV

_____

IN THE INTEREST OF J.E., A CHILD

---

On Appeal from County Court at Law No. 1
Wise County, Texas
Trial Court No. CV17-04-324

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant Mother appeals from the trial court's modification of possession and conservatorship provisions regarding son J.E. (Joshua)[1] in favor of Appellee Father. Mother raises two issues. In her first issue, Mother complains that the trial court abused its discretion by modifying her possession of Joshua as a joint managing conservator (JMC) to less than the presumptive statutory minimum guidelines. In her second issue, Mother contends that no evidence supports the trial court's modification awarding Father the exclusive right to determine Joshua's inpatient care. Because we hold that the trial court did not abuse its discretion by modifying the original decree, we affirm the trial court's judgment.

## I. Background and Procedural Facts

Mother and Father divorced in April 2018 after entering into a mediated settlement agreement (MSA) in January 2018. Joshua, their only child, was four years old at the time of the MSA and divorce. In the original divorce decree, the trial court named both parents Joshua's JMCs, awarding Father the exclusive right to designate Joshua's primary residence. Father and Mother were each awarded "the independent right to consent to [Joshua's] psychiatric and psychological treatment" and "the independent right to make decisions concerning [his] education, after consulting the

---

[1]We use aliases to refer to the minor child and his family. *See* Tex. Fam. Code Ann. § 109.002(d).

2

other parent regarding major education decisions." Under the original decree, Mother had more time with Joshua than either a standard possession order or an expanded standard possession order would have given her. *Compare* Tex. Fam. Code Ann. § 153.312 *with id.* § 153.317; *see Gerges v. Gerges*, 601 S.W.3d 46, 54–55 (Tex. App.—El Paso 2020, no pet.). In addition to holiday possession, during the school year Mother had possession of Joshua on the first, third, and fifth weekends of the month beginning when school dismissed on Friday and ending at 6:00 p.m. the following Monday. Mother also had possession of Joshua every Thursday from the time school dismissed until it resumed on Friday. During summers, Mother had possession of Joshua on an alternating week-on, week-off basis.

Father's home was in a small town in Wise County. In August 2018, a few months after the divorce and Father's subsequent remarriage, Joshua started pre-K at the local elementary school. Joshua's new stepmother (Stepmother) completed her student teaching and substituted at Joshua's school during his pre-K year.[2]

Mother filed a petition to modify the decree in March 2019, less than a year after the divorce (but more than a year after the January 2018 signing of the MSA), *see* Tex. Fam. Law Ann. § 156.102(a), and Father countersued. By that time, Mother was

---

[2]Stepmother had observed at the school before she and Father began dating.

engaged to Katherine and had moved from Northlake to Fort Worth,[3] Father and Stepmother had a child together, and Joshua was finishing his pre-K year.

In her petition to modify, Mother requested to be named the JMC with the right to determine Joshua's primary residence. *See id.* § 156.102(a). In Father's counterpetition, he requested the trial court to reduce Mother's possession to standard possession except with no midweek or Thursday visitation during the school year, to change the afterschool pick-up times to 6:00 p.m. instead of when school dismissed, and to grant him the exclusive right to consent to all psychological and psychiatric care and counseling. He also requested a mutual injunction prohibiting the parties from posting Joshua's picture on public social media. Finally, Father sought increased child support. After discovery began and Father requested a jury trial, Mother amended her petition to ask only for the exclusive right to make Joshua's education decisions, or, alternatively, to ask that Joshua be enrolled in either Decatur or Northwest ISD, as opposed to his small school district. Both Father's counterpetition and Mother's amended petition state, "The circumstances of the child, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified."

---

[3]Mother's engagement occurred in March 2018, before the original decree but after the date of the MSA. *See* Tex. Fam. Code Ann. § 156.102(a). The divorce decree contains a Northlake address for Mother. She testified at the modification trial that she and Katherine currently lived in Fort Worth.

A bench trial was held in December 2019, three months after Mother amended her petition. In the several months between the filing of the original modification petition and the trial, Joshua had completed pre-K and almost a semester of kindergarten, and Stepmother, who had been hired to teach pre-K at his school, had completed almost a semester of doing so.

Before trial testimony began, Father orally withdrew his request to eliminate Mother's weekly Thursday visits with Joshua during the school year and asked instead that she have a standard possession order during the school year (as opposed to the custom possession she then had or an expanded possession order) and that her two hours' possession on Thursdays during the school year be from 5:00 p.m. to 7:00 p.m. instead of the standard period of 6:00 p.m. to 8:00 p.m. *See id.* § 153.312. Father did not want the alternating weekly summer possession to change. At the trial, Mother, Father, Katherine, a counselor retained by Mother, Joshua's principal, and his pre-K and kindergarten teachers testified.

After hearing the evidence, the trial court awarded Father the exclusive right to make Joshua's educational decisions; enjoined the parties from posting Joshua's pictures on public social media; changed Mother's possession schedule during the school year to a standard possession order except that her Thursday visits were ordered to begin at 5:00 p.m. and end at 7:00 p.m.; and ordered the following in response to Father's request for the exclusive right to consent to all psychological and psychiatric care and counseling:

IT IS ORDERED that [FATHER] and [MOTHER] shall continue to have the independent right to consent to psychological, psychiatric[,] and counseling outpatient care, except that[ FATHER] shall have the exclusive rights concerning any inpatient care of the child.

The trial court made no other changes to the original decree.

## II. Discussion

Mother challenges only her reduced possession schedule and the trial court's decision on inpatient care. In her first issue, Mother challenges the trial court's decision to reduce her time of possession of Joshua. In her second issue, she challenges the trial court's elimination of her right to make decisions about Joshua's inpatient care.

### A. Standard of Review

We apply the same standard of review to both of Mother's issues. We review the trial court's modification of orders governing managing conservatorship and possession of the child for an abuse of discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g); *see In re A.B.H.*, 266 S.W.3d 596, 601 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g) (applying standard). A trial court abuses its discretion if it acts arbitrarily or unreasonably or does not analyze or apply the law properly. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

Whether the evidence supporting the decision is legally and factually sufficient is relevant in deciding whether the trial court abused its discretion. *T.D.C.*, 91 S.W.3d at 872. In determining whether an abuse of discretion has occurred because the

evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? *In re C.F.*, 576 S.W.3d 761, 773 (Tex. App.—Fort Worth 2019, no pet.). The applicable sufficiency review comes into play in answering the first prong. *Id.* Concerning the second prong of our abuse-of-discretion inquiry, we resolve, based on the elicited evidence, whether the trial court's decision was reasonable. *Id.* A trial court does not abuse its discretion by basing its decision on conflicting evidence if some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam); *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding); *see In re E.P.C.*, 381 S.W.3d 670, 688 (Tex. App.—Fort Worth 2012, no pet.) (en banc) ("The evidence . . . is obviously conflicting, but we do not resolve the conflicts, for that is within the factfinder's province."). "As conservatorship determinations are 'intensely fact driven,' *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record,' *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)." *In re J.J.R.S.*, No. 20-0175, 2021 WL 2273722, at *4 (Tex. June 4, 2021).

In her two issues, Mother challenges the legal sufficiency of the evidence supporting the trial court's decisions. In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to

the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005); *In re K.R.*, No. 02-15-00276-CV, 2016 WL 3198611, at *3 (Tex. App.—Fort Worth June 9, 2016, no pet.) (mem. op.). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *In re H.S.*, No. 02-17-00379-CV, 2018 WL 5832120, at *6 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op.); *K.R.*, 2016 WL 3198611, at *3. Because the trial court made no express findings in this case, we presume the trial court made all fact findings necessary to support its judgment. *Shields Ltd. P'ship*, 526 S.W.3d at 480; *In re A.M.*, 604 S.W.3d 192, 197 (Tex. App.—Amarillo 2020, pet. denied); *see In re L.B.*, No. 02-19-00345-CV, 2020 WL 1808486, at *10 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.) (applying rule in modification case); *cf. In re A.M.*, No. 02-18-00412-CV, 2020 WL 3987578, at *2 (Tex. App.—Fort Worth June 4, 2020, no pet.) (mem. op.)

8

(presuming, based on the absence of findings, that trial court found that movant in failed modification case did not meet her burden to prove either prong).

## B. Substantive Law

A court with continuing, exclusive jurisdiction over matters involving a child may modify an order that provides for the conservatorship of, or possession of and access to, that child if a preponderance of the evidence satisfies two grounds. Tex. Fam. Code Ann. § 156.001; *see id.* §§ 105.005, 156.101(a); *In re F.A.*, No. 02-16-00156-CV, 2017 WL 632913, at *3 (Tex. App.—Fort Worth Feb. 16, 2017, no pet.) (mem. op.). First, to meet the "threshold requirement," the movant must satisfy one of three statutory elements. *In re C.A.*, No. 10-16-00351-CV, 2021 WL 409621, at *8 (Tex. App.—Waco Feb. 3, 2021, no pet.) (mem. op.); *see also* Tex. Fam. Code Ann. § 156.101(a). In this case, Father was required to prove that "the circumstances of the child, a conservator, or other party affected by the order [at issue] . . . materially and substantially changed since the . . . date of the signing of a mediated . . . settlement agreement on which the order is based." Tex. Fam. Code Ann. § 156.101(a)(1)(B); *see In re A.J.L.*, No. 14-16-00834-CV, 2017 WL 4844479, at *3 (Tex. App.—Houston [14th Dist.] Oct. 26, 2017, no pet.) (mem. op.); *cf. In re Marriage of Harrison*, 557 S.W.3d 99, 139 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (op. on reh'g) (upholding trial court's modification in final decree of interim order based on MSA because evidence showed a material or substantial change in circumstances occurred after the signing of the MSA). One policy behind this requirement is "preventing

9

constant re[]litigation with respect to a child." *Obernhoff v. Nelson*, No. 01-17-00816-CV, 2019 WL 4065017, at *20 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.); *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Another is to "create stability in the conservatorship." *In re H.P.J.*, No. 14-17-00715-CV, 2019 WL 1119612, at *4 (Tex. App.—Houston [14th Dist.] Mar. 12, 2019, no pet.) (mem. op.).

To determine whether a material and substantial change of circumstances has occurred when the parties had an MSA, the trial court compares the evidence of the conditions that existed at the time of the entry of the MSA with the evidence of the existing conditions at the time of the modification trial. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(B); *cf. In re W.C.B.*, 337 S.W.3d 510, 514 (Tex. App.—Dallas 2011, no pet.) (stating in non-MSA case that starting point is the date of the order to be modified and ending point is the modification trial). The law does not prescribe any particular method for showing changed circumstances, and they may be established by circumstantial evidence. *In re E.A.D.P.*, No. 05-15-01210-CV, 2016 WL 7449369, at *2 (Tex. App.—Dallas Dec. 28, 2016, no pet.) (mem. op.); *A.L.E.*, 279 S.W.3d at 429. A factfinder is not confined to rigid or definite guidelines; instead, the determination is fact specific and must be made according to the circumstances as they arise. *In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *6 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.); *A.L.E.*, 279 S.W.3d at 428. The statute "does not

require a showing of a negative effect from the material and substantial change in circumstances, and the overriding best[-]interest[-]of[-]the[-]child standard takes into consideration whether a modification order is appropriate." *In re J.J.L., Jr.*, No. 04-12-00038-CV, 2012 WL 3985798, at *1 (Tex. App.—San Antonio Sept. 12, 2012, no pet.) (mem. op.); *see also In re J.R.L.*, No. 04-19-00049-CV, 2020 WL 2543315, at *3 (Tex. App.—San Antonio May 20, 2020, no pet.) (mem. op.).

That the modification is in the child's best interest is the second and main ground that a movant must prove. Tex. Fam. Code Ann. § 156.101(a); *In re A.E.A.*, 406 S.W.3d 404, 409 (Tex. App.—Fort Worth 2013, no pet.). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002.

Courts may use a nonexhaustive list of factors to determine a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *T.D.C.*, 91 S.W.3d at 873. Those factors include:

(A)    the [child's] desires . . . ;

(B)    the [child's] emotional and physical needs[,] . . . now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

11

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals . . . ;

(G)     the stability of the home[s];

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley*, 544 S.W.2d at 371–72 (citations omitted). Other factors to consider in modification suits include the child's stability and the need to prevent constant litigation in child-custody cases. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).

## C. Mother's Reduced Possession Schedule[4]

In her first issue, Mother complains that the trial court abused its discretion by reducing her possession of Joshua to less than the presumptive statutory minimum guidelines because there was no evidence of the circumstances at the time of the divorce, no evidence that circumstances had materially and substantially changed since then, and no evidence that the downward modification of her possession schedule of Joshua was in his best interest. Father responds that the trial court did not modify Mother's visitation to less than presumptive statutory minimum guidelines, that legally sufficient evidence of a material and substantial change supports the modification of

---

[4]Because of our disposition of this issue, we do not reach the parties' dispute about whether Mother judicially admitted a material and substantial change in circumstances. *See* Tex. R. App. P. 47.1.

12

her possession schedule, and that legally sufficient evidence supports the implied best-interest finding.

### 1. Evidence of a Material and Substantial Change

Mother contends that Father put on no evidence of Joshua's circumstances at the time of the divorce or MSA and no evidence of how the circumstances changed by the trial. She also appears to contend without citing any legal support that Father had a burden to show a material and substantial change in or directly affecting the possession schedule before the trial court could modify it. We disagree. Father's burden under the statute was to show that his, Mother's, or Joshua's circumstances had materially and substantially changed since the MSA was signed, Tex. Fam. Code Ann. § 156.101(a)(1)(B), and Father met that burden. *See J.R.L.*, 2020 WL 2543315, at *3.

### a. Circumstances at the Time of the MSA

Contrary to Mother's argument, the evidence does sufficiently show the circumstances of Joshua, Father, and Mother at the time of the MSA, our starting point. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(B); *cf. W.C.B.*, 337 S.W.3d at 514. The evidence shows that Joshua started pre-K in a public school in August 2018 and that he was in kindergarten at that same public school at the time of trial. The evidence also shows that since the MSA, Joshua gained a half-sister and a stepmother who began teaching full-time at his school and that Mother and Katherine got engaged. All this evidence circumstantially shows the status of Joshua and his parents at the time of

13

the January 2018 MSA: Joshua had not begun school, Father was not yet remarried or the parent of a second child, Stepmother was not permanently employed where Joshua would begin school, and Mother and Katherine were not engaged. *See E.A.D.P.*, 2016 WL 7449369, at *2; *A.L.E.*, 279 S.W.3d at 429.

**b. Evidence of a Material and Substantial Change in Circumstances**

The evidence also sufficiently shows that the circumstances of Mother, Father, or Joshua materially and substantially changed since the MSA. The most significant changes were Joshua's starting school and Stepmother's teaching full-time at that school. These changes impacted both Joshua and Mother.

Father and Joshua's teachers noticed that Joshua was more tired after overnight visits with Mother during the school year. Joshua was required to wake up fifteen minutes earlier and leave twenty minutes earlier for the forty-minute trip to his school from Mother's home than when he slept at Father's home. Father testified that the overnight visits with Mother were hard on Joshua and that he had observed differences in Joshua on Mondays and Fridays after the child had slept at Mother's. Joshua was "a lot more tired," "a little more exhausted," and emotionally affected after the weekends with Mother. According to Father, Fridays after Joshua's Thursday overnight visits with Mother were not as bad as the Mondays after weekends with Mother, but even on Fridays, Joshua was noticeably moody and withdrawn.

Joshua's pre-K teacher testified that sometimes when Joshua would return to school after visiting Mother, he would cling to the teacher and avoid his classmates.

14

Joshua's kindergarten teacher testified that Joshua was very tired on Mondays, but she did not differentiate between Father's weekends and Mother's weekends.

Father and Joshua's pre-K teacher also both saw changes in Joshua's behavior preceding his Thursday overnight visits with Mother. Joshua's pre-K teacher testified that she could "see definite changes on Thursday" when Joshua was scheduled to go to Mother's and that he was clingy on Thursdays (but not every Thursday) all year long. Father testified that during kindergarten, Joshua had a pattern of getting yellow marks for misbehavior on Thursdays before going to Mother's house. The kindergarten teacher testified Joshua had probably received yellow marks three times. She was not sure which day he received them—Wednesday, Thursday, or Friday, and was not really concerned because children getting "a little moody" or upset because of the confusion they felt about going to a different home on certain nights is "just part of what [teachers] see in school."

However, the evidence shows that Joshua, whom Father described as "gentle" and "soft," was sensitive to change. The pre-K teacher testified that Joshua cried at school when Mother did not attend a planned Thanksgiving brunch that the parents of the other students attended. Mother dropped off food for the brunch but then left and did not return. The teacher inferred that Joshua had expected Mother to attend and that her absence was the reason for his getting so upset that Father took him home early.

Father testified that Joshua was having a "harder time" in December of his pre-K year (December 2018), which led Father to meet with the school counselor and to have her talk to Joshua. "[T]o make sure that everything was okay for" Joshua, Father chose not to attend the pre-K Christmas party so Mother could be the only parent there and Joshua would not get upset when he had to leave.

After Father told Mother he had taken Joshua to see the school counselor, Mother, despite Father's objections, began taking Joshua to see licensed professional counselor Kevin Galey.[5] Mother told Galey that the reasons she sought counseling for Joshua were his adjustment issues concerning the divorce and Father's remarriage.

Galey testified that Joshua was confused about why Mother and Father were not together but were instead living separately with other people and was "working through understanding the complexity of the way his family [was] being developed."

Joshua was not the only one adjusting to change. When Mother and Father were married, they had always planned for Joshua to attend the school he was in fact attending. However, Mother's biggest complaints at trial concerned Joshua's school. Mother believed Father and Stepmother undermined her and tried to alienate her from the school.

---

[5]This counseling began in January 2019, two months before Mother filed her petition to modify.

The events triggering Mother's complaints began before Joshua's first day of pre-K. Mother believed that her information had been intentionally omitted from Joshua's pre-K enrollment paperwork. The typed form Mother saw when she went to meet the pre-K teacher listed Stepmother as the first parent guardian and Father as the second; Mother was omitted. Father testified that he and Stepmother filled out a handwritten form putting their own information on the front and Mother's on the back. After Mother complained about the inaccuracies and omissions in the typed form she saw, the school promptly corrected it to provide the contact information of Father, Mother, and Stepmother. When asked about the contact form on cross-examination, Mother testified that if Father and Stepmother filled out the handwritten form correctly, but school personnel typed it incorrectly, then the school personnel were "incompetent," and it "would be the school's fault, the ISD that [she was] trying to get [Joshua] out of."

Mother described numerous conflicts regarding receipt of information. Mother complained that the mailed information she received when Joshua was in pre-K was mistakenly addressed to a couple with Stepmother's given name because of the mix-ups in the enrollment paperwork discussed above. She also complained that Father would not send report cards to her, so she would have to get copies from the teacher. Mother further testified that (1) Stepmother, not Father, was on the ClassDojo app, a texting program that allowed the teacher to communicate with parents privately; (2) she had to get information about setting up a parent portal account to monitor

17

assignments, grades, and attendance directly from the school instead of from Father; and (3) Father would not log into the parent portal, but Stepmother "check[ed] back frequently." Mother wanted Father to communicate school information to her. She admitted that she had access to the same information as Father through the ClassDojo app in pre-K and Remind, a similar app used by the kindergarten teacher, but stated that she believed that he should provide the information to her directly and not "put the teacher in the middle of parenting."

Father testified that he "ha[d] all the apps" and received the emails from the parent portal. He stated that he never intentionally failed to notify Mother about school information, but he believed it was more effective to go through Stepmother. He had "started out texting" Mother school information, "but it always turn[ed] into . . . more of an argumentative thing. . . . [He] found that if [Stepmother did] the texting," Mother's replies would be short and not argumentative.

Father also testified that he had met with Joshua's teachers to explain that there were two households and that the teachers had always sent one set of information to Father and one set to Mother. Joshua's pre-K teacher testified that she made a point to send information to both sets of parents, even saving Mother's paper copies throughout the week for her to retrieve on Thursdays when she picked Joshua up from school. Joshua's kindergarten teacher testified that she had included both parents on all school communications through the Remind app and that she made an

extra copy for Mother of any letter that did not go out through the app. Mother disputed this evidence, claiming neither teacher sent out two sets of everything.

Mother also claimed that a pre-K family project included only a photograph with Joshua, Father, and Stepmother and excluded her. Joshua's pre-K teacher testified that she made another poster for Joshua at Mother's request to represent her family. The teacher admitted that it and another child's second poster were hung a short distance away from the other ones because they were made later and the posters were hung in order of completion, but she stated that all the posters were hung in the pre-K area assigned to her. Mother and Joshua did not attend the open house event at which the posters were displayed.

Mother also alleged that the pre-K teacher did not allow Joshua to take his Valentine's box home to Mother's and that "[e]very kid took their Valentine's Day box home but" him. The teacher, however, testified that some Valentine's boxes did not go home because they were displayed in the school library.

Mother and Father squabbled at the school on Joshua's first day, a Thursday. Mother testified that Father told her she should not have been at school on the morning of the first day of pre-K since it was not her possession time. Father testified that he had been frustrated at "how" Mother was there—taking all of Joshua's attention and preventing him from interacting with his new classmates.

Mother testified that on Joshua's second day of school, she told the teacher that Joshua's aunt would pick him up. The principal called Mother to report that

19

Father had said that the aunt could not pick Joshua up. However, Mother reminded the principal that the divorce decree allowed Mother to choose a competent adult to pick him up, and the principal agreed. Joshua's pre-K teacher testified that his aunt was the only person who generated a negative reaction in Joshua at pick-up times.

Mother also complained about Stepmother's working as a teacher at Joshua's school. Mother claimed that her filing the modification petition had nothing to do with Stepmother's working at the school because the petition was filed before Stepmother began teaching pre-K at the school. We note, however, that Stepmother observed at the school before her relationship with Father and that she did her student teaching there during Joshua's pre-K year. It is unclear whether Stepmother's student teaching, the job offer, or both preceded or followed the filing of Mother's petition. Regardless, Stepmother's working at the school is a notable change supporting the modification sought by Father, granted by the trial court, and challenged on appeal by Mother.

Mother testified that she believed Stepmother's working on the same hall as Joshua did not serve his best interest and interfered with his education. Mother testified that she "voiced all of these concerns" with the school before Stepmother was hired. In fact, when Stepmother was a candidate for hire, Mother met with the school principal and then contacted the superintendent and school board to try to dissuade them from hiring Stepmother to teach pre-K at Joshua's school. Even though Stepmother was not hired to teach Joshua's class, Mother testified that in

20

attempting to prevent the school district from hiring Stepmother, Mother was advocating for Joshua to try to prevent Stepmother from working "on the same hallway as him."

## c. No Abuse of Discretion

Mother concedes on appeal that a material and substantial change occurred relative to Joshua's education but denies that the change is a material and substantial change sufficient for a modification of possession. She contends that the only evidence Father offered to show a material and substantial change in circumstances was that Joshua arrived at school "a little bit sleepy" once or twice. We disagree. The evidence shows more than a child who was sleepy at school on a rare occasion. Father noticed that Joshua was more tired after visits with Mother and that he was negatively affected by impending visits with her. Joshua's pre-K teacher noticed that Joshua clung to her and avoided classmates both before and after visits with Mother. Father noticed Joshua's having issues related to Mother that convinced him to consult the school counselor. Mother believed Joshua was having sufficient adjustment issues because of the divorce and Father's marriage to Stepmother to seek counseling for him. Stepmother began teaching on the same hall as Joshua's classes, and Mother became convinced that the school she had planned to send her son to before the divorce was now woefully inadequate. We hold that some evidence demonstrates the material and substantial change in circumstances required by the statute, and the trial court did not abuse its discretion by so finding. *See J.R.L.*, 2020 WL 2543315, at *3; *In*

21

*re S.G.*, No. 08-19-00008-CV, 2020 WL 103971, at *7 (Tex. App.—El Paso Jan. 9, 2020, no pet.) (mem. op.); *Gray v. Gray*, 971 S.W.2d 212, 214 (Tex. App.—Beaumont 1998, no pet.).

## 2. Best Interest

Mother contends that no evidence supports the trial court's finding that modifying her possession downward was in Joshua's best interest. We hold that legally sufficient evidence supports the trial court's implied finding that changing the possession schedule served Joshua's best interest, looking at Joshua's emotional and physical needs and the parents' plans for him. *See Holley*, 544 S.W.2d at 371–72.

The evidence shows that the change in the schedule would allow Joshua more rest, satisfying his emotional and physical needs. *See id.* When Mother had possession of Joshua on school mornings, he would get up by 6:45 a.m. and they would leave by 7:00 a.m. for the forty-minute drive to school. Mother stated they would arrive early at school and read books until school started. She stated that Joshua "always ask[ed] that [she and Katherine] stay and read books with him until the parent bell [would] ring[]." On Joshua's school mornings with Father, Joshua would wake up at 7:00 a.m., leave for school twenty minutes later, and then either read books in the hall or go into Stepmother's classroom to play with a friend until school started, whichever Joshua wanted to do on a given day. To allow Joshua to sleep longer, Father took him to school even though Stepmother worked at the same campus. The evidence of the

22

parents' routines with Joshua shows that he could sleep later when he slept at Father's and would spend less time on the road.

Father testified that reducing Mother's overnight possession on school nights would be in Joshua's best interest. Father explained that his request to reduce Mother's possession time was not motivated by a desire to take time away from Mother; rather, his request for a change was what he believed to be in Joshua's best interest. The tiredness and negative emotional effects he observed with Joshua were "around the time frame that [Mother had]" possession of him. Father's modification request was "strictly about [Joshua's] best interest and keeping him happy and healthy and ready for every day." Father explained, "He's got to be—I mean, he has to be ready for school. He has to be—he can't have the little mental instability, not a real good way of saying it, but he can't—I don't want him distracted, I guess is a way to put it."

Mother did not want the possession schedule to change. She testified that Joshua's best interest was served by not changing the possession schedule: "This is what he knows, and this is what he's accustomed to." Her testimony demonstrated a lack of concern for time he spent in the car on days traveling to and from school with her or Katherine. In advocating for Joshua to have to go to Northwest ISD every day

instead of his local school, Mother testified about the one to two days a week she (or Katherine)[6] drove him to school:

> I believe that he's doing just fine driving from Fort Worth to [his school] now. It is our time in the morning to discuss the prospect of his day, to discuss how he's going to behave that day, what he's learned in school, what he will be learning in school, how his day will play out.

Katherine testified that reducing Mother's time with Joshua would not be in his best interest because Mother was "his safe person." Katherine saw Joshua go to Mother "no matter what[ was] wrong" and saw him "seek that in her and her give it back 100 percent every time." However, Katherine did not address the issue of Joshua's being tired at school after spending nights with Mother, nor did Katherine address the issue of his behavior and moods on Thursdays in anticipation of spending nights with Mother. Further, Joshua's kindergarten teacher had observed him with both parents, and even when both parents were on the same field trip, Joshua gravitated to Father. She had observed Father and Joshua to have a very good, very strong relationship.

The trial court also had evidence from which to doubt Mother's sincerity in starting the modification process. When Mother admitted that she had filed the modification petition seeking a custody change less than a year after the divorce and then amended it to seek only a modification of the right to direct Joshua's education,

---

[6]Katherine testified that she drove Joshua to school on most Fridays because of Mother's work schedule.

she stated that she did not want to modify custody and that she only "wanted a foot in the door."[7] Although she sought the exclusive right to direct Joshua's education, the evidence shows that unlike Father, Mother had not taken a consistent, active interest in what Joshua was learning at his school. While the kindergarten teacher testified that both parents had spoken to her several times about Joshua's progress, the pre-K teacher testified that Father had often asked what Joshua needed to be working on and how he could help Joshua progress. Mother had not. Mother communicated with the pre-K teacher through ClassDojo, but according to the teacher, she and Mother did not discuss the curriculum, academics, what Joshua was learning, or how Mother could help him move forward. Thus, the trial court had evidence from which to find that Joshua's best interest and stability were not Mother's top priorities when she filed this modification lawsuit. *See Obernhoff*, 2019 WL 4065017, at *20; *H.P.J.*, 2019 WL 1119612, at *4; *see also Holley*, 544 S.W.2d at 371–72.

Viewing all the evidence in the light most favorable to the trial court's implied best-interest finding, we hold that the evidence sufficiently supports it. Assuming without deciding that Mother elected an expanded standard possession schedule, and again viewing all the evidence in the light most favorable to the trial court's best-

---

[7]We note that Mother has not challenged the trial court's awarding Father the exclusive right to make decisions concerning Joshua's education.

interest finding, we further hold that the evidence supports the trial court's implied finding that the election was not in Joshua's best interest, for the reasons discussed above. *See* Tex. Fam. Code Ann. § 153.317(a)(1), (2); *Ruiz v. Ruiz*, No. 02-12-00136-CV, 2013 WL 530958, at *4, *5 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem. op.). Consequently, we hold that the trial court did not abuse its discretion by impliedly finding that modifying Mother's weekend and Thursday possession during the school term by eliminating her overnight possession on school nights was in Joshua's best interest.[8]

### 3. Resolution

Some evidence supports the trial court's implied finding that a material and substantive change in circumstances occurred since the parties' MSA, and some evidence supports the implied best-interest findings. The trial court therefore did not abuse its discretion by modifying Mother's possession schedule. We overrule her first issue.

### D.    Right to Determine Inpatient Care

In her second issue, Mother contends that no evidence supports the trial court's modifying the original decree by awarding Father the exclusive right to

---

[8]Because we uphold the trial court's implied best-interest findings, we do not delve into the parties' dispute about how much less time with Joshua Mother now has, although we do note that the bulk of the time Mother lost with Joshua was time that he would spend asleep or in school.

determine Joshua's inpatient care.[9] We agree with Father that Mother's briefing is inadequate. In the interest of justice, however, we note that the evidence sufficiently supports the modification and therefore the trial court did not abuse its discretion.

Father sought the exclusive right to make all mental-health decisions for Joshua. The trial court gave Father partial relief, ruling that each parent would "continue to have an independent right to consent to psychological, psychiatric, and counseling outpatient care, but" awarding Father "the exclusive rights concerning any inpatient care." The modification order tracked the ruling.

Although we agree with Mother that there is no direct evidence on inpatient care, the evidence of Mother's and Father's clashing views on counseling circumstantially supports the ruling. Joshua went to counseling, which included play therapy, before the divorce. That counseling ended when the counselor told the parents that Joshua no longer needed it. Mother implied that she had disagreed with the counselor and Father's decision to end the counseling.

In December 2018, after first meeting with Joshua's school counselor alone, Father set up a session between Joshua and the school counselor without first discussing it with Mother because Father had concerns about Mother based on

---

[9]It is clear from the context of the ruling and the order that the trial judge was addressing inpatient care only as it relates to counseling, psychological care, or psychiatric care. The trial court did not modify the original decree as to the parents' rights to consent to Joshua's physical health care, and the parties do not argue otherwise.

Joshua's "actions and some stuff" Father was seeing. After meeting with Joshua, the school counselor told Father that Joshua did not need counseling. When Father told Mother about the matter afterward, Mother suggested that Joshua needed to begin play therapy again. Father testified that he did not agree, since the school counselor had just told him that Joshua did not need counseling and the pre-divorce counselor had also recommended ending counseling. Mother testified that Father did not agree to more counseling because he did not want Joshua "to think anything was wrong with him."

Mother testified that Father told her she could do whatever she wanted regarding counseling during her periods of possession. Father did not recall saying that. Despite Father's objections, Mother began taking Joshua to see Galey. Galey met with Mother and Joshua seventeen times by the time of trial. The counseling sessions were a combination of family counseling and play therapy. Play therapy was one-on-one with just Joshua, but the family counseling included Mother and usually Katherine.

Father met with Galey only once, and Father initiated that sole session. Galey had never contacted Father. When Father contacted Galey's office, the person Father spoke to was "under the impression that [Father] was not a custodial[] parent and that [he] did not even see [Joshua] regularly."

In explaining why he wanted the exclusive right to make all of Joshua's mental-health decisions, Father testified that he believed he had done pretty well at dealing

with issues as they arose, and he did not "want [Joshua] growing up thinking, wow, I need a counselor to make me feel better." Father also did not want Joshua going to two counselors, each chosen by a different parent, during the same period.

Additionally, Galey's testimony supports the ruling. He admitted the difficulty that arises when both parents have the right to consent to treatment:

> Q. As a psychologist, and probably more in administration, is it difficult when both parents have equal rights on psychiatric and psychological and counseling?
>
> A. It's very challenging because the questions always come down to what's motivating each individual, what's behind it, do they understand the perception that each person is dealing with when they go to make the decisions, how are they making the decisions, are they basing it on what they know and what Joshua needs, or are they basing it on what they feel.

We also note that the trial court's decision makes logical sense because Mother's having the right to consent to inpatient care could impinge on Father's unchallenged, exclusive rights to make Joshua's education decisions and to determine his primary residence.[10]

Because some evidence supports the trial court's awarding Father the exclusive right to make decisions concerning Joshua's inpatient mental-health care, the trial court did not abuse its discretion by doing so. *See In re D.L.N.*, 609 S.W.3d 237, 239–

---

[10]Mother abandoned her challenge to Father's exclusive right to determine Joshua's primary residence before trial, and she does not challenge on appeal the trial court's awarding Father the exclusive right to make Joshua's educational decisions.

47 (Tex. App.—Texarkana 2020, no pet.); *cf. Trammell v. Trammell*, 485 S.W.3d 571, 578–81 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding no abuse of discretion in modifying order that gave one parent the exclusive right to determine psychological and psychiatric treatment to now require the parents to share in the decision-making when sufficient evidence supported the modification). We overrule Mother's second issue.

## III. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: July 1, 2021